Michael W. **SHOWERS,** Ann G. Showers, **Plaintiffs,**

**v.**

Steven A. **SPANGLER,** Larry **Haynes, Greg Houghton, Tim Smith, Howie Kessel, Ron Clouser, James R. Beard, J.R. Fagan, David Sloan, Peter S. Duncan, all in their individual capacity, Defendants.**

Civil Action No. 1:CV–95–183.

United States District Court, M.D. Pennsylvania.

Mar. 5, 1997.

---

James R. Ronca and John F. Duggan, Schmidt & Ronca, P.C., Harrisburg, PA, for Plaintiffs.

Fredrick Cabell, Jr., Office of the Attorney General, Harrisburg, PA, for Defendants.

*MEMORANDUM*

CALDWELL, District Judge.

The Plaintiffs, Michael W. Showers and Ann G. Showers, brought this civil rights action against the Defendants, officers of the Pennsylvania Game Commission, alleging violations of their right to be free from unreasonable searches and seizures under the United States and Pennsylvania Constitutions. Before us is Defendants' motion for summary judgment, under Fed.R.Civ.P. 56.

I. *Background*[1]

Plaintiffs own and operate Bear Mountain Taxidermy, Inc. Michael W. Showers ("Showers") is a taxidermist, operating under a permit issued by the Pennsylvania Game Commission. Showers' Pennsylvania taxidermist's permit requires "strict observance of all applicable laws." (Showers Dep., vol. I, ex. A). Plaintiffs' business is in three separate buildings, adjacent to their home. (M.F., ¶ 8).

Defendants are all officers of the Pennsylvania Game Commission. Defendants Spangler, Haynes, Houghton, and Smith are employed as Wildlife Conservation Officers ("WCO" or "Conservation Officer"). Defen-

dant Kessel is employed as a Deputy Game Warden. Defendant Clouser is the Game Commission's Regional Law Enforcement Director. Defendant Beard is the Game Commission's Deputy Director of Law Enforcement. Defendant Fagan is the Game Commission's Director of Law Enforcement. Defendant Sloan is the Game Commission's South Central Pennsylvania Regional Director. Defendant Duncan is the Game Commission's Executive Director.

The complaint advances claims under the Fourth and Fourteenth Amendments to the United States Constitution, and under Article 1, Section 8 of the Pennsylvania Constitution. These claims arise out of a search of Plaintiffs' residence and business property by Defendants on April 13, 1993, and out of the seizure of a taxidermy mount of a wolf and a caribou (the "wolf-caribou mount"), which occurred on May 19, 1993, and continued until August 19, 1993.

Prior to April 13, 1993, Showers sent letters to Defendants Sloan and Duncan, both Spangler's superiors, complaining that Spangler was harassing him, and seeking their assistance. (Showers Dep., vol I, at 42–47; Plaintiffs' Docs. 1 & 2).

On Tuesday, April 13, 1993, at approximately 9:00 a.m., a team of eight[2] Game Commission officers, including Defendants Clouser, Haynes, Houghton, Kessel, Smith, and Spangler, conducted an inspection[3] of Plaintiffs' property. The inspection was conducted pursuant to a four-page operation plan, titled "Operation U–Haul," prepared by Defendant Spangler. (Spangler. Dep. at 179–80; Plaintiffs' Doc. 3). The inspection included an examination of Plaintiffs' business premises, a review of Plaintiffs' business records, and the examination of animal remains stored in various freezers in the busi-

---

**1.** As we are presently considering a motion for summary judgment, we will consider the facts in the light most favorable to the Plaintiffs. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 553 (1986).

**2.** There appears to be some disagreement as to exactly how many officers participated in the April 13 inspection. We do not regard the precise figure as dispositive.

**3.** As discussed below, the question of whether Defendants' actions on April 13 constitutes an "inspection" or a "search" is one of some significance. Our use of the term "inspection" here is not meant to suggest a legal conclusion regarding the character of the action for Fourth Amendment purposes.

ness premises and in Plaintiffs' home. (Showers Dep., vol. I, at 91, 94–98, 104–05, 117–23).

On May 19, 1993, Defendant Spangler placed a seizure tag on the wolf-caribou mount. At the time, the mount was on display at Bowhunters Warehouse, in Wellsville, Pennsylvania. The mount included a grey wolf, for which Showers possessed a CITES (Convention on International Trade in Endangered Species) export permit from Quebec. (Spangler Decl., ¶ 8; Plaintiffs' Doc. 5, at 9; Showers Aff., ¶ 14). Showers possessed no other permits pertaining to the grey wolf. (Spangler Decl., ¶ 8; Showers Aff., ¶ 14). Spangler believed that Showers was attempting to sell the mount. (Spangler Decl., ¶ 5).

On May 19, 1993, in connection with the seizure of the wolf-caribou mount, Spangler filed charges with two District Justices regarding the possession and sale of an endangered species without a permit. Showers and his attorney met with Game Commission officials, including Defendants Beard, Clouser, and Sloan on June 3, 1993. (M.F. ¶ 39; Beard Dep. at 89–90)

Spangler withdrew the charges regarding sale of an endangered species on June 4, 1996, at the direction of his superiors. (M.F. ¶¶ 38–39). Spangler withdrew the possession of an endangered species charges on August 5, 1993, at the direction of his superiors. (M.F. ¶ 41). On August 19, 1993, Spangler removed the seizure tag from the mount. (M.F. ¶ 42).

Plaintiffs contend that both the April 13 search and the seizure of the wolf-caribou mount were unlawful under the United States and the Pennsylvania Constitutions. Defendants have moved for summary judgment under Rule 56, arguing that the searches and seizures were constitutional, and that all Defendants are protected by the doctrine of qualified immunity.

## II. *Standard of Review*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In reviewing the evidence, facts and inferences must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 553 (1986). Summary judgment must be entered in favor of the moving party "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party...." *Id.,* 475 U.S. at 586–87, 106 S.Ct. at 1356, 89 L.Ed.2d at 552 (citations omitted).

When a moving party has carried his or her burden under Rule 56, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts...." *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356, 89 L.Ed.2d at 552 (citations omitted). The nonmoving party "must present *affirmative evidence* in order to defeat a properly supported motion for summary judgment," and cannot "simply reassert factually unsupported allegations contained in [the] pleadings." *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989) (citation omitted). However, "[i]f the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986) (citations omitted).

## III. *Discussion*

### A. The Constitutional Provisions

The Fourth Amendment provides that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amd. 4. The Fourth Amendment is incorporated as against the States by the Fourteenth Amendment. *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

Article 1, Section 8 of the Pennsylvania Constitution provides that: "The people

shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures...." Pa. Const. art. I, § 8. Despite the similarity between the two constitutions' provisions, they are not coextensive. *Commonwealth v. Kohl,* 615 A.2d 308, 314–15, 532 Pa. 152, 165 (1992). For us to consider any possible differences between the Federal and the Pennsylvania constitutions, however, the parties must address these differences squarely in their briefs. *Commonwealth v. Edmunds,* 526 Pa. 374, 387–391, 586 A.2d 887, 894–95 (1991). As the parties have not done so, we will consider the motion solely in the context of Fourth Amendment jurisprudence.

### B. Qualified Immunity

The Supreme Court has stated that "government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982). Even where they violate clearly established rights, officials will nonetheless be immune from suit if they acted in a manner which they reasonably believe to be lawful. *Orsatti v. New Jersey State Police,* 71 F.3d 480, 483 (3d Cir.1995). The focus of this inquiry is objective reasonableness: whether a reasonable officer could have believed that the search was lawful, "in light of clearly established law and the information the searching officers possessed." *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523, 532 (1987). The Defendants' subjective beliefs about the lawfulness of the search are irrelevant. *Id.* Indeed, Defendants are entitled to qualified immunity even if they *knew* that their conduct was unlawful, so long as a "reasonable public official" would not have known. *Grant v. Pittsburgh,* 98 F.3d 116, 123–24 (3d Cir.1996).

The Defendants' state of mind *may* be considered, however, where "state of mind is an essential element of the constitutional violation itself." *Id.* at 124. Subjective knowledge of unlawful conduct will not defeat qualified immunity by itself, but a defendant is not entitled to qualified immunity where a reasonable public official could not have believed the search to be lawful in light of the state of mind which motivated the search. *Id.* at 124–25. An allegation of improper motive will not preclude the entry of summary judgment on behalf of a defendant based on qualified immunity, however, if state of mind is not an essential element of the violation. *Id.* at 125–26.

State of mind is relevant only where "clearly established law makes the conduct illegal depending on the intent with which it is performed." *Id.* at 125 (quoting *Halperin v. Kissinger,* 807 F.2d 180, 184 (D.C.Cir. 1986)). In *Grant,* for example, the Third Circuit held that inquiry into the defendants' state of mind was called for where the plaintiffs had alleged a substantive due process violation, based on defendants' politically motivated arbitrary and capricious conduct in nominating plaintiffs' buildings for historic preservation (and thereby preventing their demolition by plaintiffs). *Id.*

Plaintiffs allege violations of their rights to be free from unlawful searches and seizures. State of mind is *not* an essential element of a cause of action for a Fourth Amendment violation. *Maryland v. Macon,* 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370, 378 (1985); *United States v. Johnson,* 63 F.3d 242, 246–47 (3d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2528, 135 L.Ed.2d 1052 (1996). Defendants' state of mind is, therefore, irrelevant. We must consider Defendants' entitlement to qualified immunity in light of the objective reasonableness of their conduct, without regard to their state of mind.

For a right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039, 97 L.Ed.2d at 531. While the right need not have been held unlawful under factually identical circumstances, "in the light of pre-existing law the unlawfulness must be apparent." *Id.; Good v. Dauphin County Social Serv. for Children & Youth,*

891 F.2d 1087, 1092 (3d Cir.1989). A conclusion after the fact that the conduct is unlawful is insufficient, since law enforcement officers should not "be expected to anticipate subsequent legal developments." *Bieregu v. Reno,* 59 F.3d 1445, 1458 (3d Cir.1995).

C. The April 13, 1993, Search.[4]

The holder of a Pennsylvania taxidermist's permit is subject to certain statutory and regulatory requirements:

> Each permit holder shall keep accurate records of all transactions carried out under authority of the permit issued and any other information required by the director. The records must be kept for a period of three years and shall be open to inspection by any officer of the commission during normal business hours and shall be the basis of any reports required by the commission.

34 Pa.Cons.Stat.Ann. § 2907 (the "Inspection Statute").

> A holder of a permit shall keep a record of transactions on a form provided by the Commission in accordance with the instructions provided. The record, together with the premises, shall be open to inspection upon demand of an officer of the Commission. A permittee shall answer, without evasion, questions that may be asked by a representative or officer of the Commission relative to ownership of a bird or mammal or part thereof, found in the permittee's possession or under the permittee's control, or which has passed through the permittee's hands.

58 Pa.Code § 147.1(b) (the "Inspection Regulation"). As the holder of a permit from the Pennsylvania Game Commission, Showers was subject to these requirements. Pennsylvania law therefore obliged him to hold his business premises and records open to Defendants for inspection. Defendants argue that, in light of this, the April 13 search was lawful (and was, therefore, objectively reasonable). Plaintiffs counter that the Inspection Regulation is unconstitutional and exceeds the scope of the Inspection Statute.

An individual's expectation of privacy in commercial property is greatly reduced when the property is being used in a "closely regulated" industry. *New York v. Burger,* 482 U.S. 691, 700, 107 S.Ct. 2636, 2642, 96 L.Ed.2d 601, 612 (1987). In such industries, authorities may be authorized to make regulatory inspections without a warrant without violating the property owner's Fourth Amendment rights. *Id.; United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); *Donovan v. Dewey,* 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1978). In a case concerning a federal inspection of a gun dealer, the Supreme Court explained: "When a dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business, records, firearms, and ammunition will be subject to effective inspection." *Biswell,* 406 U.S. at 316, 92 S.Ct. at 1597, 32 L.Ed.2d at 92–93.

For a warrantless inspection to comport with the Fourth Amendment under this exception, three requirements must be satisfied:

(1) This inspection must be made under a regulation which advances a substantial government interest;

(2) The inspection must be necessary to further the regulatory scheme; and

(3) The inspection program must provide a constitutionally adequate substitute for a warrant, by adequately placing the property owner on notice that he or she will be subject to such searches, and by carefully limiting the discretion of the inspecting officers.

*Burger,* 482 U.S. at 702–03, 107 S.Ct. at 2644, 96 L.Ed.2d at 614.

Plaintiffs argue that the inspection scheme under which the April 13 search was conducted fails to satisfy these conditions. Plaintiffs contend first, that the Inspection Regulation is unlawful in that it authorizes inspections beyond the scope of the Inspection Statute, second, that the Inspection

---

**4.** Plaintiffs have not alleged any involvement in the search on the part of Defendants Beard, Duncan, Fagan, or Sloan. These Defendants are therefore entitled to summary judgment on Plaintiffs' claims arising from the search.

Regulation fails to provide a constitutionally adequate substitute for a warrant, and third, that the regulatory inspection was merely a pretext for a search in furtherance of a criminal investigation.[5] While each of these objections has merit, we must conclude nonetheless that Defendants are entitled to qualified immunity.

### 1. Regulation Inconsistent with Statute.

■ Plaintiffs suggest that the Inspection Regulation's authorization of premises inspections is invalid, as inconsistent with the language of the Inspection Statute. The Inspection Statute provides that a permittee's business *records* "shall be open to inspection by any officer of the commission." 34 Pa. Cons.Stat.Ann. § 2906. The Inspection Regulation is more expansive, requiring that records, "together with the premises, shall be open to inspection upon demand of an officer of the Commission." 58 Pa.Code § 147.1(b). The Regulation therefore purports to authorize premises inspections, although they are not authorized by statute.

■ When a regulation is inconsistent with, or extends beyond, the statutory scheme it is intended to advance, the regulation is invalid. *McComb v. Wambaugh,* 934 F.2d 474, 481 (3d Cir.1991); *Hospital Assoc. of Pa. v. MacLeod,* 410 A.2d 731, 733, 487 Pa. 516, 521 (1980). That appears to be the case here. The Inspection Regulation's premises inspection provision is inconsistent with the Inspection Statute's inspection language.

The Inspection Regulation's premises inspection language is, therefore, invalid.

### 2. Adequacy of Warrant Substitute.

Plaintiffs argue that the Inspection Regulation does not satisfy the requirements for a regulatory inspection exception to the warrant requirement. Specifically, Plaintiffs maintain that the regulation does not sufficiently limit the discretion of the inspecting officers, and therefore does not provide a constitutionally adequate substitute for a warrant. *See Burger,* 482 U.S. at 703, 107 S.Ct. at 2644, 96 L.Ed.2d at 614.

[16] For a warrantless regulatory inspection to be proper,

> the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant. In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers.... [I]n defining how a statute limits the discretion of the inspectors, ... it must be carefully limited in time, place, and scope.

*Id.* (citations, internal quotation marks, and brackets omitted). Plaintiffs suggest that the Inspection Regulation fails to adequately limit the discretion of Conservation Officers by limiting the time, place, and scope of inspections.

---

5. Plaintiffs also suggest in passing that taxidermy is not a closely regulated business under *Burger.* Plaintiffs do not pursue this argument, and we believe that the closely regulated industry exception does apply to taxidermists as a general matter. *See United States v. Johnson,* 994 F.2d 740, 742 (10th Cir.1993).

In addition, Plaintiffs argue that the Commission had not placed the Inspection Regulation in effect at the time of the search. The Inspection Regulation requires permittees to keep records on forms promulgated by the Commission; Plaintiffs assert that these forms were not promulgated until after the April 13 search. This argument is unpersuasive in two respects: first, in support of their allegation that the Commission failed to promulgate the required forms, Plaintiffs cite to the deposition of J.R. Fagan,

Director of the Commission's Bureau of Law Enforcement. Plaintiffs have, however, failed to provide Fagan's deposition testimony in support of their position. *See In re TMI,* 89 F.3d 1106, 1117 (3d Cir.1996), *cert. denied, Aldrich v. General Pub. Util. Corp.,* — U.S. ——, 117 S.Ct. 739, 136 L.Ed.2d 678 (1997). More significantly, we can not see what relevance the promulgation of record keeping forms has to the inspection of a permittee's records and/or premises. Even if the Commission has not provided forms to permittees as envisioned in the regulation, permittees are nonetheless required to keep some form of record as required by the statute and regulation, and are clearly placed on notice that whatever records they keep will be subject to inspection by the Commission.

■ While the Inspection Regulation does not specify when inspections may be conducted, the Inspection Statute authorizes inspections only during "normal business hours." 34 Pa.Cons.Stat.Ann. § 2906. Such a limitation is sufficient under *Burger.* 482 U.S. at 711, 107 S.Ct. at 2648, 96 L.Ed.2d at 619 (approving inspection during "regular and usual business hours").[6]

The Inspection Regulation is less limited in place and scope. The Regulation authorizes inspections of records and premises of any permittee. It does not make clear what premises may be inspected, or what may be examined on those premises. The regulations which have been upheld under *Burger,* in contrast, generally provide much more specific guidance to the law enforcement officers conducting the search. *See, e.g., Burger,* 482 U.S. at 711–12, 107 S.Ct. at 2648, 96 L.Ed.2d at 619–20; *S & S Pawn Shop Inc. v. Del City,* 947 F.2d 432, 439 (10th Cir.1991); *Lesser v. Espy,* 34 F.3d 1301, 1309 (7th Cir. 1994); *United States v. V–1 Oil Co.,* 63 F.3d 909, 912 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1824, 134 L.Ed.2d 929 (1996). The Inspection Regulation's failure to limit the inspecting officer's discretion through careful limitations of place and scope render it unconstitutional.

### 3. Pretext Doctrine

■ An administrative inspection may not be used as a pretext to gather evidence as part of what is in fact a criminal investigation. *United States v. Johnson,* 994 F.2d 740, 742 (10th Cir.1993); *Burger,* 482 U.S. at 716 n. 27, 107 S.Ct. at 2651, n. 27, 96 L.Ed.2d at 623 n. 27; *see also Whren v. United States,* —— U.S. ——, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Whether an administrative inspection is in fact a pretext for a criminal investigation is an inherently factual question. *Johnson,* 994 F.2d at 743.

The issue of whether the April 13 inspection was a *bona fide* administrative inspection, or part of a criminal investigation, is a

question of material fact which would have to be resolved at trial. Indeed, the facts not in dispute appear to suggest that the April 13 inspection may have been more criminal than regulatory in nature. A typical administrative inspection involves a single law enforcement officer, conducting a periodic check of conditions at the regulated premises to determine if is being operated in accordance with the law. (*See* Beard Dep. at 61–62, 64–65). The April 13 inspection, on the other hand, was conducted by a team of eight Conservation Officers, pursuant to a written operation plan, and intended to discover evidence of specific suspected wrongdoing. An operation of this nature was unusual for the Game Commission, (*see* Houghton Dep. at 78–79; Haynes Dep. at 130–31), and more closely resembles a search than an inspection.

### 4. Qualified Immunity

■ Despite the concerns discussed above, it is clear from the materials submitted in support of the motion for summary judgment that all of the Defendants are entitled to the protection of qualified immunity for their conduct on April 13, 1993.

We have concluded that the Inspection Regulation's authorization of warrantless premises inspections is invalid as inconsistent with the Inspection Statute. This infirmity will not, by itself, prevent Defendants from relying on the Inspection Regulation in their qualified immunity defense, so long as a reasonable officer would have believed the search to be lawful, "in light of clearly established law." *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3040, 97 L.Ed.2d at 532. The invalidity of a premises inspection under the Inspection Regulation was by no means established at the time of the search. Indeed, it appears that Pennsylvania courts have heretofore treated the Inspection Regulation as valid. *Commonwealth v. Neitzel,* No. 949–15024 (Phila.Common Pleas, Jul. 20, 1995), *aff'd,* 678 A.2d 369, 451 Pa.Super. 1 (1996).

---

6. Plaintiffs object that the April 13 search was not conducted during "normal business hours," as the search began at 9:00 a.m., and Plaintiffs' business is not open until 10:00 a.m. We conclude that the "normal business hours" limitation in the Inspection Statute can be reasonably construed to refer to normal business hours in general, not the established business hours of the inspected premises.

We also must conclude that Defendants' reliance on the Inspection Regulation is not rendered unreasonable by the Regulation's failure to sufficiently limit the place and scope of the inspection. Not only has this flaw not previously been identified, but the determination of this issue was particularly close. Indeed, Plaintiffs have not directed us to any cases in which an administrative inspection scheme was struck down on this basis. While the Inspection Regulation fails to provide an adequate warrant substitute, this was not clearly established at the time of the search.[7]

Finally, the April 13 inspection is not rendered unreasonable by the unresolved question of whether or not the inspection was actually a pretext for a criminal investigation. The pretext doctrine was not established law in April of 1993, when the search in question took place. We have not found, nor have the parties identified, any reported decisions from any court in the Third Circuit in which a finding of pretext has been employed to invalidate an otherwise proper administrative inspection; it appears that the doctrine has been expressed clearly only in the Tenth Circuit. The first case to reach this conclusion, *Johnson*, was decided in May of 1993, after the search in question took place. 994 F.2d 740. The only authority extant at the time of the search which suggests that it was not a proper administrative inspection, therefore, was the dicta found in footnote 27 in *Burger*. That footnote points out, in support of *Burger's* conclusion that the search before the Court did not violate the Fourth Amendment, that: "There is ... no reason to believe that the instant inspection was actually a 'pretext' for obtaining evidence of respondent's violation of the penal laws. It is undisputed that the inspection was made solely pursuant to the administrative scheme." 482 U.S. at 716 n. 27, 107 S.Ct. at 2651 n. 27, 96 L.Ed.2d at 623 n. 27.

The *Burger* Court did not conclude that the administrative inspection exception to the warrant requirement is unavailable where the inspection is a pretext for a criminal investigation; that question was not before it. While we conclude here that *Johnson* is correct in so finding, we must also conclude that this was not clearly established law in April of 1993. Defendants are, therefore, entitled to qualified immunity.

D. The Seizure of the Wolf–Caribou Mount.

**1. The Initial Seizure on May 19, 1993.**

■ Defendant Spangler [8] argues that he is entitled to qualified immunity for the seizure of the wolf-caribou mount on May 19, 1993. He contends that the grey wolf is an endangered species, and that a reasonable WCO would have concluded that Showers' possession of the wolf, supported only by the CITES export permit, was unlawful.

The grey wolf is listed as an endangered species in the Code of Federal Regulations. 50 C.F.R. § 23.23. It is therefore an endangered species under Pennsylvania law. 34 Pa.Cons.Stat.Ann. § 102. While Plaintiffs have offered some evidence to suggest that grey wolves are not in fact endangered in Quebec, (*see* Plaintiffs' doc. 9 (Kirkland Report)), the wolf's presence on the federal endangered list makes it endangered as a matter of Pennsylvania law, and renders Spangler's belief that the wolf is an endangered species objectively reasonable.

As it is unlawful in Pennsylvania to possess or sell an endangered species without a permit to do so, 34 Pa.Cons.Stat.Ann. §§ 2167, 2924(d), Spangler's seizure of the wolf-caribou mount was reasonable so long as a reasonable WCO would have believed that a CITES permit was insufficient under 34 Pa. Cons.Stat.Ann. § 2924. *See* 34 Pa.Cons.Stat. Ann. §§ 102, 2167.

Pennsylvania law recognizes only permits issued by the Pennsylvania Game Commission for the possession or sale of endangered

---

7. Plaintiffs have not raised, and we therefore do not consider, the question of whether or not "premises" in the Inspection Statute could reasonably be interpreted to include the freezers in Plaintiffs' residence.

8. Plaintiffs' allegations do not suggest that any Defendant other than Spangler was involved in the initial seizure of the wolf-caribou mount. All other Defendants are therefore entitled to summary judgment on this claim.

species. 34 Pa.Cons.Stat.Ann. § 2924. Plaintiffs suggest that the deposition testimony of Defendant Beard, the Game Commission's Deputy Director of Law Enforcement, establishes that a CITES permit is nonetheless acceptable under Pennsylvania law. Beard's testimony, however, agrees with the plain meaning of the statute, which requires a permit issued by the Commission. (Beard Dep. at 98, 142–43). Beard does state that some Commission officials (himself included) would chose not to prosecute for unlawful possession of an endangered species under Section 2924 when the possession was supported by a CITES permit. (*Id.* at 98–99, 143–44). It is also true that the charges against Showers were ultimately dropped. (M.F. at ¶¶ 38–39, 41).

These facts can not change the insufficiency of a CITES permit under Section 2924. The seizure of the wolf was, moreover, motivated by a concern that Plaintiffs were attempting to sell an endangered species, in violation of Section 2924. (Spangler Decl., ¶¶ 5, 14). Beard's testimony makes clear that while a CITES permit is often treated as sufficient for the *possession* of an endangered species, a Game Commission permit is always required for the *sale* of an endangered species. (Beard Dep. at 97–99, 146). Plaintiffs' attempt to sell an endangered species without a permit from the Game Commission was a clear violation of 34 Pa.Cons. Stat.Ann. § 2924. Spangler's seizure of the wolf-caribou mount was, therefore, objectively reasonable.

### 2. Maintenance of the Seizure until August 19, 1993.

Plaintiffs assert that the maintenance of the seizure of the wolf-caribou mount until August 19, 1993, constitutes a violation of their Fourth Amendment rights.[9] The period in which Defendants maintained a seizure tag on the mount, rendering it effectively seized, is marked by four dates:

(1) May 19, 1993 Spangler places seizure tag on mount and files charges;

(2) June 4, 1993 Spangler withdraws unlawful sale charges;

(3) August 5, 1993 Spangler withdraws unlawful possession charges;

(4) August 19, 1993 Spangler removes seizure tag from mount.

The maintenance of the *de facto* seizure, through the continued presence of the seizure tag on the mount, violated Plaintiffs' Fourth Amendment rights if unreasonable in duration. *See United States v. Place,* 462 U.S. 696, 708–09, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110, 122 (1983); *United States v. Frost,* 999 F.2d 737, 742 (3d Cir.1993). Defendants are entitled to summary judgment on this claim, therefore, only if the delay in removing the tag was objectively reasonable.

As we have already determined, the initial placement of the seizure tag was reasonable and, it appears, justified under Pennsylvania law. It appears that the charges against Showers were withdrawn following a series of discussions between Plaintiffs and the Commission, including the June 3 meeting and subsequent correspondence. The maintenance of the seizure from May 19 to June 4 is reasonable under these circumstances. During this brief period, all of the charges against Showers were pending, and Defendants reasonably viewed the mount as contraband under 343 Pa.Cons.Stat.Ann. § 2167.

The reasonableness of the delay from June 4 to August 19, however, is impossible to assess on the record as it now stands. There is insufficient evidence in the record to conclusively establish to the degree necessary for a grant of summary judgment whether the wolf-caribou mount was contraband until the tag was removed on August 19. Summary judgment is therefore inappropriate on this issue.

### IV. *Conclusion*

All of the Defendants are entitled to summary judgment on all claims, with the exception of the claims arising from the continued seizure of the wolf-caribou mount from June

---

**9.** Plaintiffs' allegations do not suggest any involvement in the maintenance of the seizure of the wolf-caribou mount on the part of Defendants Clouser, Haynes, Houghton, Kessel, and Smith. These Defendants are, therefore, entitled to summary judgment on this claim.

4 to August 19. Trial on this remaining issue is therefore necessary.