GILBERTSON, Chief Justice
(dissenting).
[¶ 38.] I respectfully dissent. I would conclude that taxidermy is not a pervasive *62 ly regulated business in South Dakota. The actual regulation of taxidermy consists of a single statute with minimal administrative regulations, no specific direction to game officials on when and how to implement inspections, a minimal number of actual inspections, and no organized records of when inspections were conducted or their results. The majority opinion’s holding establishes a dangerous basis to conclude pervasive regulation exists every time the Legislature passes a single statute concerning regulation of an occupation, profession or business enterprise. Moreover, even if taxidermy were pervasively regulated, the regulatory scheme established by Game, Fish and Parks does not comply with all three prongs of the Burger test. Specifically, SDCL 41-6-33 and its minimal regulations do not provide constitutionally adequate protections substituting for the protections afforded by the Fourth Amendment warrant requirement. Therefore, I disagree with the majority opinion and circuit court. I would conclude that SDCL 41-6-33, as enforced, is unconstitutional.

Taxidermy Not Pervasively Regulated

[¶ 39.] The focus of this case is not the overall regulation of wild game in South Dakota; it is the regulation of the taxidermy business. I would conclude that taxidermy is not a pervasively regulated industry in South Dakota. What is significant about the pervasively regulated requirement is that it informs a business owner that he has a reduced, not a nonexistent, expectation of privacy. Marshall v. Barlow’s, Inc., 436 U.S. 307, 312, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978). It is not enough that an industry is pervasively regulated if those regulations do not inform a business owner that his property will be subject to periodic inspections undertaken for specific purposes. New York v. Burger, 482 U.S. 691, 703, 107 S.Ct. 2636, 2644, 96 L.Ed.2d 601 (1987). Furthermore, the Supreme Court has stated that closely regulated industries are an exception rather than the rule, and has rejected an expansion of such an exception. Marshall, 436 U.S. at 313, 98 S.Ct. at 1820.
[¶ 40.] The Supreme Court of the United States has made clear that whether an industry is pervasively regulated is a threshold test for applying the three Burger prongs. See Burger, 482 U.S. at 702, 107 S.Ct. at 2643-44. The majority opinion asserts that “closely regulated industry status is an important consideration in cases like this because it often informs the question whether the statutory language satisfies Burger s third criterion by providing a constitutionally adequate substitute for a warrant.” Majority opinion ¶ 13. However, it is important to remember that this threshold test is not a prong itself. Burger, 482 U.S. at 702, 107 S.Ct. at 2644. To lose this distinction is to lose the constitutional foundation for the warrant exception. Marshall, 436 U.S. at 311-12, 98 S.Ct. at 1819-20.
[¶ 41.] Using the authority provided by SDCL 41-2-18(24), Game, Fish and Parks adopted two pages of regulations governing taxidermy which, as part of the contents, includes a reproduction of SDCL 41-6-33. The balance of the two-page document contains the following headings: “Definitions”; “Records”; “Immediate tagging of specimen”; “Transfer of specimens to another taxidermist”; “Buying, Selling, Trading”; and, “Violation is cause for revocation of license.”[17] Thus, a taxidermist in South Dakota must adhere to less than two pages of regulations. These two pages hardly establish a “regulatory presence [that] is sufficiently comprehensive *63 and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.” Burger, 482 U.S. at 705 n. 16, 107 S.Ct. at 2645 n. 16 (citing Donovan v. Dewey, 452 U.S. 594, 600, 101 S.Ct. 2534, 2539, 69 L.Ed.2d 262 (1981)). Even though a taxidermist is told that his or her business records are subject to inspection, this statement alone does not reasonably lead to an expectation that he or she is entering into a business where there is going to be extensive government oversight. While the relevant laws and regulations are provided to taxidermists, they do not indicate how or when they are enforced, if at all. Furthermore, neither the statute nor the taxidermist’s application provide a “specific purpose” for why the search is being conducted. See Donovan, 452 U.S. at 600, 101 S.Ct. at 2539. Without this information, it is difficult to understand how mere regulation of taxidermy has reached a “pervasive” level.
[¶ 42.] The circuit court found taxidermy was a pervasively regulated business because taxidermists are required to file an application,[18] pay a fee,[19] keep records of specimens they receive, make their records available for inspection, and be subject to criminal punishment for failure to comply. These factors are based on a list found in Burger, 482 U.S. at 704-05, 107 S.Ct. at 2645. There is no indication that this list was meant to be exhaustive. Furthermore, neither the State nor the majority opinion is able to provide any case law from any other jurisdiction which, after actually analyzing this issue, has construed taxidermy as a pervasively regulated business.[20]
*64 [¶ 43.] The majority opinion relies on the fact that taxidermy has been in the South Dakota Code since 1925. Majority opinion ¶ 5. It is not enough, however, to rely solely on the length of time because it is the substance of the statute that is significant. South Dakota’s history of taxidermy regulation is minimal. SDCL 41-6-33 was adopted in 1925 and has been revised several times. S.D. Sess. Laws 1925 ch. 181.[21] Significantly, the statute as enacted in 1925 required that, to obtain a license for taxidermy, the applicant must be a “properly accredited person.” Moreover, the licensee must “prove to the satisfaction of the state game warden that he is a fit person to be entrusted with such a privilege[.]” S.D. Sess. Laws 1925, ch. 181, § 1. However, the portion of SDCL 41-6-34, which related to proof of fitness required for a taxidermist’s license and existed from 1925 to 1991, was repealed by the Legislature in 1991. This indicates a legislative intent for less, not more, regulation of the taxidermy industry. There are no other statutes related to taxidermy, with the exception of SDCL 41-2-18. While the history of the statute may date back to 1925, the substance has been relatively unchanged and the extent of statutory oversight diminished for substantial periods of time.
[¶ 44.] Next, the enforcement of the statute by Game, Fish and Parks does not demonstrate that taxidermy is being pervasively regulated by that agency. This Court cannot look at what state officers are supposed to do in a vacuum. When the record is available, we must also look *65 at what they actually do. Officer Brown testified that he had only done four inspections in eight years. Despite being in Brown County for eight years and actually driving by the Klager premises, he had never previously inspected it. Officer Cochran testified to conducting four inspections in three-and-a-half years. Klager testified he had never been inspected in the eight- and-a-half years he had been in the business. The Law Enforcement Program Administrator for Game, Fish and Parks, Andy Alban, estimated that one hundred inspections were done every year. He also stated that there are approximately 200 licensed taxidermists in South Dakota. However, additional testimony revealed that Game, Fish and Parks does not keep records of whether or when a business is inspected. Thus, when officers report that they conducted an inspection of a taxidermist, that information is not connected to the individual taxidermist’s record. It is therefore impossible to know how often or how many taxidermists have been actually inspected. There is no requirement that every taxidermist ever be inspected.
[¶ 45.] Furthermore, there is conflicting testimony about whether officers receive any training regarding administrative searches. The majority opinion fails to recognize the dispute in the record regarding training of Game, Fish and Parks officers in conducting inspections. Majority opinion ¶ 6. Shon Eide testified that he used to be the Training Coordinator for Game, Fish and Parks before becoming the Licensing Supervisor. He stated that new officers are “given a general knowledge base of how to do inspections ... and which items or which areas that we need to do inspections in.” However, Eide never testified specifically to Officer Brown’s training. He also did not state what constituted a “general knowledge base” or during what time period that type of training was conducted. Officer Brown was unequivocal in testifying that he had not received any training on conducting inspections.
[¶ 46.] The evidentiary conflict is between no training and “a general knowledge base of how to do inspections.” Certainly if this was a pervasively regulated area, then officers would need guidance on how to conduct their searches appropriately. There is no conflict, however, that whether and how often the searches should be conducted is completely at the discretion of individual officers. According to Officer Cochran, “I am just working on still getting around to all of [the taxidermists] with all of our other inspections that we do. That’s like I said, usually go and visit with them when we get a chance.” There is no agency policy or regulation regarding the frequency of the searches, which demonstrates that such searches are not an agency priority. If taxidermy was pervasively regulated, there would be some written policy or directive regarding the frequency of the searches and a record of the results. In examining taxidermy’s regulatory scheme as a whole, the history, language, and enforcement do not indicate that it is a pervasively regulated business.[22]
*66 [¶ 47.] Because the State has not proven that taxidermy is a pervasively regulated business in South Dakota and thus failed to fulfill the threshold requirement, the three prongs of the Burger test need not be applied. But even if taxidermy were pervasively regulated in South Dakota, the search of Klager’s records would still be unconstitutional because the enforcement of SDCL 41-6-33 fails to satisfy the Burger*s third prong.[23]

Burger’s Third Prong Not Satisñed

[¶ 48.] The third prong of Burger requires that “the statute’s inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant.” 482 U.S. at 703, 107 S.Ct. at 2644. “In other words, the regulatory statute must perform the two basic functions of a warrant: [1] it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and [2] it must limit the discretion of the inspecting officers.” Id. We now address the scope of a search under SDCL 41-6-33 and the discretion of officers in conducting such a search.[24]

Defined Scope

[¶ 49.] To advise business owners that a “search is being made pursuant to the law and has a properly defined scope ... the statute must be ‘sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.’ ” Id. (citing Donovan, 452 U.S. at 600, 101 S.Ct. at 2539). Normally, the scope of a search is confined by a warrant. U.S. Const, amend. TV (a warrant must' state with particularity the place to be searched and the things to be seized). The scope of warrantless administrative searches must be confined by the controlling statutes and regulations.
[¶ 50.] The scope of SDCL 41-6-33 is very broad, as it allows inspection of “customer specimens” and customer records— basically all that would be of interest to officials charged with enforcement of the game laws in this State concerning inspection of a taxidermy business. While the relevant laws and regulations are provided to taxidermists and conservation officers, they do not limit the scope other than to business hours and to records from the last five years. Nor do the regulations provide any limitations to the scope of the officers’ discretionary searches of taxidermists.
[¶ 51.] In reading SDCL 41-6-33 and the corresponding regulations, the require *67 ment is that records “shall be made available,” but there is no required place where those items shall be kept. They could be at a taxidermist’s business, but also at a home or other location not open to the public. A taxidermist’s business could be located in his home. Without proper training on what is an acceptable location to search or manner to demand “production” of the records, this could result in a situation where an officer is in a home searching for a taxidermist’s records and specimens. See Warrington Twp. v. Powell, 796 A.2d 1061, 1069-70 (Pa. Commw.Ct.2002) (holding that warrantless administrative periodic fire safety inspections of portions of business that are not open to public were not allowed if entry had been refused by owner because there was no evidence to show business was closely regulated). Because conservation officers are not effectively trained on how to conduct searches and there are only vague regulations on where they can go to inspect the records or specimens, the scope of this statute is too broad to provide an adequate substitute for the warrant requirement.

Limit on Inspecting Officers’ Discretion

[¶ 52.] We now turn to the second basic function that a regulatory statute must perform as required by Burger — that it limit the discretion of Game, Fish and Parks officers to search under SDCL 41-6-33. Burger, 482 U.S. at 70S, 107 S.Ct. at 2644. “[I]n defining how a statute limits the discretion of the inspectors, we have observed that it must be ‘carefully limited in time, place, and scope.’ ” Id (citing United States v. Biswell, 406 U.S. 311, 315, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972)). The Supreme Court has stated that “[t]he authority to make warrantless searches devolves almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and whom to search.” Marshall, 436 U.S. at 323, 98 S.Ct. at 1825-26. Although the Court went on to say in Burger that “[i]f inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential,” Burger, 482 U.S. at 710, 107 S.Ct. at 2648 (citing Biswell, 406 U.S. at 316, 92 S.Ct. at 1596), the Court also stated that “warrantless inspections of commercial property may be constitutionally objectionable if their occurrence is so random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that his property will from time to time be inspected by government officials.” Donovan, 452 U.S. at 599, 101 S.Ct. at 2538 (emphasis added) (citing Marshall, 436 U.S. at 323, 98 S.Ct. at 1826).
[¶ 53.] The case of Showers v. Span-gler, 957 F.Supp. 584 (M.D.Pa.1997), rev’d on other grounds, 182 F.3d 165 (3rd Cir. 1999), provides analysis of Burger’s third prong. Pennsylvania Wildlife Conservation officers conducted a warrantless search of Showers’ taxidermy shop under Pennsylvania statute and regulations to examine his records, animals, and their parts. Two mounted animals were seized. Showers attacked the regulation, claiming it did not sufficiently limit the discretion of the inspecting officers and therefore did not provide a constitutionally adequate substitute for a warrant. The Showers Court concluded that the search and seizure was unconstitutional because it failed to limit the officer’s discretion through careful limitations of place and scope. 957 F.Supp. at 591-92 (citing Burger, 482 U.S. at 703, 107 S.Ct. at 2644). See also Showers, 182 F.3d at 168 n. 1 (upon appeal on other issues, the Third Circuit concluded, “we leave this portion of the District Court’s order and its thoughtful analysis, undisturbed”).
*68 [¶ 54.] After a review of the testimonial record, there is no dispute that administrative searches of taxidermists are done completely at the discretion of individual Game, Fish and Parks officers as long as they are done during business hours. There is no regulatory limit on the discretion of the individual officers in choosing whether and how often to conduct a search. See Burger, 482 U.S. at 711, 107 S.Ct. at 2648 (stating that “the vehicle dismantler knows that the inspections to which he is subject do not constitute discretionary acts by a government official but are conducted pursuant to statute.”). Inspections could go from non-existent to daily events. The enforcement by Game, Fish and Parks is so “random, infrequent, [and] unpredictable” that, in reality, taxidermists have no real expectation that their business will be searched. See Donovan, 452 U.S. at 599, 101 S.Ct. at 2538 (citing Marshall, 436 U.S. at 323, 98 S.Ct. at 1826). This is supported by Klager’s testimony that he was not searched in eight years and Officer Brown’s testimony that he only conducted four inspections in eight years. Infrequency of inspection dilutes the justification for upholding war-rantless searches. Unlike the gun dealer in Biswell, 406 U.S. at 311, 92 S.Ct. at 1594, or the mine operator in Donovan, 452 U.S. at 604, 101 S.Ct. at 2541, the taxidermist who is receiving his first inspection in his eight years of business will be “left to wonder about the purposes of the inspector or the limits of his task.” Biswell, 406 U.S. at 316, 92 S.Ct. at 1596.
[¶ 55.] In order to ensure that discretion to conduct administrative searches is not abused by an officer, it is necessary that Game, Fish and Parks establish statutory or regulatory standards to provide adequate protections in lieu of the Fourth Amendment warrant requirement as required by Burger’s third prong. See State v. Lecarros, 187 Or.App. 105, 66 P.3d 543, 547 (2003) (court found that administrative search of boat by officers violated defendant’s rights because no “governmental entity ha[d] created rules to limit the discretion of ... officers in carrying out boat searches or seizures, nor could the officers articulate any such rules. Indeed, their uncontradicted testimony establishes that the decision to seize or not to seize any particular craft was entirely within their discretion.”). Otherwise, “[w]here [the Legislature] has authorized inspection but made no rules governing the procedures that inspectors must follow, the Fourth Amendment and its various restrictive rules apply.” Colonnade Catering Corp. v. United States, 397 U.S. 72, 77, 90 S.Ct. 774, 777, 25 L.Ed.2d 60 (1970). In other words, if there are no standards, then a warrant is necessary. The statutory or regulatory standards called for by Burg-ees third prong function like a warrant, which assures an owner that “reasonable legislative or administrative standards for conducting an ... inspection are satisfied with respect to a particular establishment.” Donovan, 452 U.S. at 599, 101 S.Ct. at 2538 (citing Camara v. Mun. Ct. of City & Cnty. of S.F., 387 U.S. 523, 538, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967)). This assumes that such standards have been enacted, which is not the case here.
[¶ 56.] In addition to limiting an officer’s discretion as to whom to search, statutory or regulatory standards should also address how often searches must be conducted. In Donovan, the Supreme Court upheld the Federal Mine Safety and Health Act of 1977 as not offending the Fourth Amendment in part because the Act required inspection of all mines, and specifically defined the frequency of inspection. Donovan, 452 U.S. at 603-04, 101 S.Ct. at 2540-41. The Court stated that:
*69 the Act itself clearly notifies the operator that inspections will be performed on a regular basis. Moreover, the Act and the regulations issued pursuant to it inform the operator of what ... standards must be met in order to be in compliance with the statute. The discretion of Government officials to determine what facilities to search and what violations to search for is thus directly curtailed by the regulatory scheme.
Id., 452 U.S. at 605, 101 S.Ct. at 2540 (emphasis added).
[¶ 57.] The majority opinion repeatedly alleges that SDCL 41-6-33 is analytically similar to the statute at issue in Burger.[25] Majority opinion ¶¶ 24, 25, 27, and 33. While similarities may exist, it is beside the point. It is the haphazard enforcement of SDCL 41-6-33 that makes it unconstitutional, not the language of the statute itself. The enforcement of the statute in Burger differs significantly from the enforcement of SDCL 41-6-33. In Burger, the Supreme Court noted that members of the New York City Police Department’s Auto Crimes Division conducted five to ten inspections per day. 482 U.S. at 693-94, 107 S.Ct. at 2639. This consistent and prevalent enforcement is at the opposite end of the spectrum from the rare, random, and discretionary enforcement of SDCL 41-6-33 in South Dakota. The enforcement of a statute must be examined because the language of a statute cannot be analyzed in isolation.
[¶ 58.] SDCL 41-6-33 and its regulations do not effectively limit the scope or discretion of a search conducted under this statute. These constitutional flaws in the regulatory scheme are demonstrated through the testimony of the conservation officers. As previously noted, Officer Brown testified that he only conducted four inspections in eight years. He candidly admitted whether a taxidermist’s records are checked is completely at his discretion. Officer Cochran testified to conducting four inspections in three-and-a-half years. Klager testified that he had never been inspected in the eight-and-a-half years he had been in the business. The Law Enforcement Program Administrator for Game, Fish and Parks, Andy Alban, estimated that 100 inspections were done every year. He also stated that there are approximately 200 licensed taxidermists in South Dakota. Significantly, additional testimony revealed that Game, Fish and Parks does not keep records of whether or when a business is inspected. Thus, when officers report that they conducted an inspection of a taxidermist, that information is not connected to the individual taxidermist’s record. It is therefore impossible to know how often or how many taxidermists have been inspected. There is no requirement that any taxidermist ever be inspected. Nor is there a requirement that taxidermists submit any records or other information to Game, Fish and Parks on a regular basis. The only time Game, Fish and Parks will see any reference to the records is if an inspection is conducted, and even then only if there is a search of the officer’s daily activity logs. Finally, there is still the problem of the officers’ lack of training on how to properly conduct searches. See supra ¶ 7.[26]
*70 [¶ 59.] If taxidermy was regulated so that it provided a “constitutionally adequate substitute to the warrant requirement,” there would be some written policy or directive regarding the frequency and method of the searches, as well as a record of the results. This manner of unorganized enforcement does not comport with the dictates of Burger “in defining how a statute limits the discretion of the inspectors ... it must be carefully limited in time, place and scope.” 482 U.S. at 703, 107 S.Ct. at 2644. In examining the regulatory scheme of taxidermists under the facts of this case, this Court should have concluded that this scheme does not adequately protect Fourth Amendment rights so that a constitutional search of a business can be conducted.
[¶ 60.] In conclusion, the State has failed to show that taxidermy is a pervasively regulated business in South Dakota. Furthermore, even if taxidermy were pervasively regulated, the search under SDCL 41-6-33 and its regulatory scheme fails Burger’s third prong. I would conclude that SDCL 41-6-33, as enforced, is unconstitutional and reverse.
[¶ 61.] MEIERHENRY, Justice, joins this dissent.
*71 [[Image here]]
*72 [[Image here]]

. The "Laws and Regulations for Taxidermists” document is appended to this decision.

. The application Klager filled out consisted of his name and address. This minimal information is in contrast to the application in Burger that required the operator of a vehicle dismantling business to provide "a listing of all felony convictions and all other convictions relating to the illegal sale or possession of a motor vehicle or motor vehicle parts, and a listing of all arrests for any such violations by the applicant and any other person required to be named in the application.” Burger, 482 U.S. at 704 n. 15, 107 S.Ct. at 2645 n. 15. The application also required the place of business to conform to code provisions and that "all persons having a financial interest in the business have been determined ... to be fit persons to engage in such business.” Id. Also in contrast to Burger, SDCL 41-6-33 provides that "[t]he Game, Fish and Parks Commission shall approve each taxidermist's license.” As noted at oral argument, the statute does not grant Game, Fish and Parks the ability to deny any applicant a license. Unlike most regulated professions, any citizen can get a taxidermist's license, regardless of qualifications or training.

. The majority opinion argues that the $15 fee for a taxidermist license is significant because it "demonstrates that police regulation, rather than revenue raising, was the motive behind the [Legislature’s] enactment of the licensing procedure.” Majority opinion ¶ 16. As support, the majority opinion cites People v. Taylor, 138 Ill.2d 204, 149 Ill.Dec. 297, 561 N.E.2d 667, 672 (1990). This quote, however, is taken out of context. The Supreme Court of Illinois analyzed whether a criminal statute that prohibited engaging in the business of taxidermy was unconstitutionally vague. To assume that the fee in this case was to facilitate police regulation is to assume legislative intent without any support.

.The majority opinion relies on United States v. Johnson, 994 F.2d 740 (10th Cir.1993), to support its position that taxidermy is a closely regulated business. Majority opinion ¶ 18. In that case, the defendant owned a taxidermy shop that was searched as part of an investigation of illegal transportation of animal parts. He was prosecuted under federal felony statutes concerning protected game. The court stated that "Mr. Johnson, as the owner of a closely regulated business, was subject to regulatory inspections.” Johnson, 994 F.2d at 742 (citing Burger, 482 U.S. at 699-701, 107 S.Ct. at 2642-43). We do not find this opinion persuasive as the court did not analyze whether taxidermy is closely regulated, rather it merely assumed so. Of interest, however, is the testimony of a conservation officer who *64 worked for the State of Wyoming that he routinely checked taxidermy shops in his area once or twice a year. Id. at 743. Additionally, the majority opinion relies on Showers v. Spangler, 957 F.Supp. 584, 591 n. 5 (M.D.Pa.1997), rev’d on other grounds, 182 F.3d 165 (3rd Cir.1999), as support that taxidermy is closely regulated. Majority opinion ¶ 18. The footnote in Showers concedes that although the plaintiffs in that case suggested that taxidermy was not a closely regulated business under Burger, they did “not pursue this argument.” We can only conclude from the court’s language that the plaintiffs did not fully brief and argue the issue and therefore the court did not conduct an analysis. Although the district court stated it did “believe that the closely regulated industry exception does apply to taxidermists as a general matter,” the court relied on Johnson as support. Therefore, the majority opinion has failed to provide any authority resulting from actual analysis that taxidermy is a closely regulated industry.

. The revisions have been minor. Regarding inspections, the original statute, adopted in 1925 (S.D. Sess. Laws 1925, ch. 181), was amended in the 1939 codification although the scope of the statute remained basically the same. The 1939 revision provided, "Each such licensee must keep a written record of all birds, animals, and fish received by him, and the books, offices, or buildings in which such records and such specimens are kept must at all times be open for inspection by any representative of the Commission.” SDC § 25.0302(11) (1939). The language regarding inspections remained unchanged until 2003, when the Legislature amended the statute:
Each licensee shall keep a written record of all birds, animals, and fish received by him the licensee. The record shall include the name and address of each specimen's owner, the number and species, and the dates of receipt and delivery of each specimen. The books, offices, or buildings in-which ree-ords and specimens are kept shall at — all-■fetes record and customers’ specimens shall he open- made available for inspection by any representative of the Department of Game, Fish and Parks during normal business hours.
S.D. Sess. Laws 2003, ch. 222, § 1.
The 1925 statute declared violations to be a misdemeanor with a fine of not less than $10 or more than $100. The 1939 revision set forth no explicit criminal or civil penalties for a violation. The clause providing criminal penalties was not reinstated until 1991. S.D. Sess. Laws 1991, ch. 337, § 25. Thus, between 1939 and 1991, there was no penalty for failing to comply with the statute.

. The regulation of attorneys makes an interesting subject for comparison. The regulation is mandated by the South Dakota Constitution, art. V, § 12. The licensing and regulation of attorneys fills four chapters of the Code. SDCL chs. 16-16, 16-17, 16-18 and 16-19. A chapter is dedicated to a single subject — the discipline of attorneys. SDCL ch. 16-19. Attorneys are also subject to the South Dakota Rules of Professional Conduct found in the appendix to SDCL ch. 16-18 which takes up an additional 142 pages in the Code. The rules are enforced by the Disciplinary Board of the State Bar of South Dakota and ultimately the South Dakota Supreme Court. The substantial case law *66 that exists also establishes a long term enforcement of the rules for the protection of the public and removal of those who commit serious violations.

. I agree with the majority opinion that prong one of the Burger test is satisfied. Because Klager conceded prong two at oral argument, I do not analyze the issue here.

. The majority opinion notes that “the businessman in a regulated industry in effect consents to the restrictions placed upon him.” Majority opinion ¶ 13 (citing Marshall, 436 U.S. at 313, 98 S.Ct. at 1821). Immediately above the signature line, the application for a taxidermy license states, "I will keep a record of all specimens received for mounting or preserving. These records and specimens shall be made available for inspection by any authorized representative of the South Dakota Department of Game, Fish and Parks during normal business hours. Specimens will be tagged according to regulation.” It is significant that taxidermists must consent to searches under SDCL 41-6-33 before they can obtain a license. We should be careful in expanding the "consent” in this case, because it was made in order to obtain a license, which amounts to holding a taxidermist's livelihood hostage.

. The majority opinion argues that this view is adopted from Justice Brennan's dissent in Burger. Majority opinion ¶ 29. However, this dissent does not include a single citation to Justice Brennan’s writing. While the majority opinion may perceive some similarities to his writing, this opinion is an application of the Burger majority and Fourth Amendment warrant requirement.

. This lack of training could result in unintended and dangerous consequences. Although Officer Brown testified that he acted with appropriate demeanor during the confrontation, at trial he conceded that although *70 armed, he had received no training on what to do during an inspection in the event that someone refused to comply with his request to produce records. Klager disputes how Officer Brown acted. Officer Brown testified that during the confrontation he was “pretty emotional” and that Klager was "quite angry” with him. Klager testified, however, that it was a “scary situation ... I was terrified.”