

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-29-1999

# Showers v. Spangler

Precedential or Non-Precedential:

Docket 98-7122

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Showers v. Spangler" (1999). *1999 Decisions.* Paper 179.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/179

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 29, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-7122

MICHAEL W. SHOWERS; ANN G. SHOWERS

v.

STEVEN A. SPANGLER; LARRY HAYNES; GREG
HOUGHTON; TIM SMITH; HOWIE KESSEL; RON
CLOUSER; JAMES R. BEARD; J. R. FAGAN; DAVID
SLOAN; PETER S. DUNCAN, all in their individual
capacity

Michael W. Showers; Ann G. Showers,

      Appellants

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 95-cv-00183)
Honorable William W. Caldwell

Argued: February 18, 1999

BEFORE: GREENBERG, LEWIS and
BRIGHT,* Circuit Judges

(Filed June 29, 1999)

_____

*Honorable Myron H. Bright, United States Circuit Judge for the 8th
Circuit Court of Appeals, sitting by designation.

James R. Ronca, Esq. (Argued)
Schmidt & Ronca
209 State Street
Harrisburg, PA 17101
Counsel for Appellants

Howard G. Hopkirk, Esq. (Argued)
15th Floor
Office of the Attorney General of
 Pennsylvania
Strawberry Square
Harrisburg, PA 17120
Counsel for Appellees

OPINION OF THE COURT

BRIGHT, Circuit Judge.

I.

Following a warrantless search of their home and business, Michael and Ann Showers brought this civil rights action against Wildlife Conservation Officer Steven Spangler and his co-defendants -- all officers or officials of the Pennsylvania Game Commission. The District Court granted summary judgment in favor of the defendants after finding them entitled to qualified immunity. Because we conclude, however, that an objectively reasonable law enforcement officer in Spangler's position would know that searches such as the one made in this case may only be carried out under a properly executed warrant, summary judgment based on qualified immunity was improvidently granted in his favor. We therefore reverse the District Court's ruling as to Officer Spangler, although we affirm in all other respects.

II.

We review questions of qualified immunity and summary judgment de novo and consider the evidence presented to the District Court in a light most favorable to the non-

2

moving party. See Assaf v. Fields, No. 98-7153, 1999 WL 312324, at *4 (3d Cir. May 19, 1999). After review, the following facts appear from the developed record.

Michael Showers ("Showers") is a licensed taxidermist. In the spring of 1992, Showers owned and operated Bear Mountain Taxidermy ("Bear Mountain") in the small town of Arendtsville, near Gettysburg, Pennsylvania. Bear Mountain was comprised of three buildings -- including a showroom, studio, and preparation facility -- all of which were co-located on a one-acre parcel of land next to Showers's separate, personal residence.

Taxidermists practice their trade under special permits issued by the Pennsylvania Game Commission ("Commission"). Language on the face of the permit requires strict compliance with all state and federal game laws, including 34 Pa. Cons. Stat. Ann. S 2907 ("Inspection Statute") which states that:

> Each permit holder shall keep accurate records of all transactions carried out under authority of the permit issued and any other information required by the director. The records must be kept for a period of three years and shall be open to inspection by any officer of the commission during normal business hours and shall be the basis of any reports required by the commission.

A corresponding regulation promulgated by the Commission requires that:

> A holder of a permit shall keep a record of transactions on a form provided by the Commission in accordance with the instructions provided. The record, together with the premises, shall be open to inspection upon demand of an officer of the Commission.

58 Pa. Code S 147.1(b)(1993) ("Inspection Regulation").1
_____

1. As part of this case, the District Court invalidated S 147.1(b) because it determined that the Inspection Regulation failed to circumscribe the discretion of law enforcement officers with respect to the time, place, and scope of authorized inspections. See Showers v. Spangler, 957 F. Supp. 584, 591-92 (M.D.Pa. 1997). Neither the defendants nor the Commonwealth of Pennsylvania contest the District Court's determination of this issue. Hence we leave this portion of the District Court's order, and its thoughtful analysis, undisturbed.

3

Steven Spangler ("Spangler"), at the time of the events in question, was a Wildlife Conservation Officer ("WCO"). He was assigned by the Commission to enforce Pennsylvania's game laws, and he had primary jurisdiction for taxidermists in Adams County, including Arendtsville.

The relationship between Showers, Spangler, and the events giving rise to this case, appear to begin as far back as March 26, 1992. At that time, Spangler charged one of Showers's customers with taking a wild turkey out of season. As part of his investigation, Spangler questioned Showers and examined Bear Mountain's official records -- including those related both to the allegedly illegal turkey as well as those related to other animals passing through Showers's shop. Showers informed Spangler that he understood the turkey to have been taken in-season and then frozen for future preparation.

Four days later, on March 30, 1992, Showers found that Officer Spangler had entered his business when Showers was not there, searched through materials, some in a non-public area of the shop, and examined Bear Mountain's log book. When confronted, Spangler indicated that he was entitled to inspect the business records "anytime he wanted to[,] with or without [Mr. Showers's] permission." Affidavit of Michael Showers, App. at 137a.

As a result of this incident, Showers sent a letter of complaint to defendant Peter Duncan, the Commission's Executive Director, on May 8, 1992. In this letter, Showers alleged that Spangler was harassing him and conducting his duties in an unprofessional manner. See App. at 97a-99a. Although it is clear that Showers and Spangler also disagreed over fundamental interpretations of the game laws, this letter was clearly precipitated by Spangler's surreptitious entry into Showers's showroom and Spangler's subsequent examination of Showers's records in his absence. Id. at 97a-98a.

Although Duncan did not respond to the May 8 letter, word of Mr. Showers's complaints apparently filtered back to Officer Spangler because he confronted Showers on June 2, 1992 and expressed his displeasure that Showers had not dealt directly with him rather than sending "a letter to

4

Harrisburg." App. at 100a. Spangler appeared at Showers's shop and told him, among other things, that: Showers should not have "gone over his head"; that he, Spangler, was "the law in this jurisdiction"; that "you have to do what I say"; and that he would regulate Showers "the way I see fit." App. at 137a–138a. In short, he belligerently threatened to "check [Showers] out . . . if [he] refused to cooperate" by conducting invasive and time-consuming searches of Showers's freezers. App. at 101a. In response, Showers told Spangler that he would never consent to searches of this type and that if Spangler intended to conduct such a search he should have a warrant. According to Showers, Spangler went on to tell Showers, "you'd well do as you're told or I will put you out of business period, point blank." Deposition of Michael Showers, Dist. Ct. Doc. 24, Vol. I at 155.

On August 14, 1992, Showers wrote a second letter of complaint, this time to Regional Director David Sloan. See App. at 100a–103a. This letter described the June 2 confrontation and indicated that Spangler was continuing to harass and threaten him.[2]

In response to the letter of August 14, a meeting was held between Showers, Spangler, and one of Spangler's superiors, defendant Ron Clouser. At that meeting, Mr. Clouser admitted the impropriety of Spangler's threats. He acknowledged that random searches were not the policy of the Commission and that Spangler had "personal problems" that were influencing his job performance. App. at 138a.

After seven months in which no contact apparently
_____

2. Showers's allegations of continued harassment in the summer of 1992 have their genesis in testimony he gave after being subpoenaed in the prosecution of the sportsman that Spangler had previously accused of taking a wild turkey out of season. The sportsman was acquitted after Showers testified that the turkey's feathers showed damage consistent with a bird that had been long frozen, thus corroborating the sportsman's defense that he had in fact taken the turkey in season and then froze it for a period of time prior to mounting it. With his prosecution of the sportsman scuttled, Spangler apparently became angry "because [Showers] did not testify the way [Spangler] wanted." App. at 136a.

occurred between Showers and Spangler, Spangler and another WCO attended a local auction on March 26, 1993. There they found a "wolf-caribou mount" owned by Showers.3 Because the wolf is an endangered species, in order to buy, sell, or possess such a carcass, certain paperwork must be in order and, by Commission practice and policy, must include either a permit issued by the Commission or a CITES4 permit in lieu thereof.

On March 31, 1993, Spangler met with Showers to review Bear Mountain's records with respect to the wolf-caribou mount and other items sold at the auction. Showers showed Spangler his CITES permit, which authorized export of the wolf from Canada, as well as his purchase records for the wolf.

Determined to take enforcement action against Showers, despite the fact that his possession of the wolf appeared to be legal, Spangler contacted defendant James Beard, head of the Commission's Special Investigations Unit, in an attempt to initiate an undercover operation targeting Showers for criminal prosecution. Mr. Beard declined to start such a probe because, in his view, the evidence collected by Spangler did not suggest criminal wrongdoing. App. at 162a.

Nevertheless, on April 12, 1993, Spangler obtained a search warrant for the Showers's premises and drew up an elaborate four-page plan for "Operation U-Haul." Both steps were highly unusual. Search warrants were not a regular part of the inspection routine.5 Nor were detailed operation

_____

3. This mount is a large artistic representation of the predator-prey relationship in which a full-sized, stuffed wolf appears to be attacking a full-sized, stuffed caribou.

4. CITES is the Convention on International Trade in Endangered Species, a multi-party international treaty which governs national obligations with respect to endangered species and the use of products related thereto.

5. With respect to search warrants, Officer Spangler was asked at his deposition:

> Q: When you normally did an inspection, would you get a search warrant prior to the inspection?

6

plans.6

On the morning of April 13, 1993, eight armed and uniformed Commission officers descended on the Showers's business and residence.7 Citing authority to conduct an administrative inspection under statute and regulation, neither Spangler nor any other officer produced, served, or mentioned the search warrant. At no time did Showers affirmatively consent to the search, nor was he advised by the officers of his right to refuse.

Despite Showers's complaints of illegality, the search proceeded. Officers questioned Showers about a variety of animals in his shop. Over a period of several hours, Spangler and the other officers searched the showroom, studio, and freezers located in the preparation areas of the business. An officer stayed with Showers during the entire period of the search. At one point, Officer Spangler became so hostile and belligerent toward Showers that other officers removed him from the shop in order to "calm him down."

_____

        A: No, sir.

        Q: Why did you do it in this case?

        A: Because Mr. Showers had told me -- told me and put in one
        of those letters of complaint that he was not going to allow a search
        of his freezers.

Deposition of Steven A. Spangler, Dist. Ct. Doc. 25 at 166.

6. With respect to operation plans, Officer Spangler was asked:

        Q: In how many other cases have you made up a detailed plan
        like that for the purpose of investigation or a search?

        A: This is the most detailed. I don't recall having done that
        before.

        . . . .

        This I think may have been the only one . . . .

Deposition of Steven A. Spangler, Dist. Ct. Doc. 25 at 180.

7. Participants in the raid, in addition to Officer Spangler, were co-defendants Haynes, Houghton, and Smith (all WCOs) and Deputy WCO Kessel. Also present but not named in this suit were Deputy WCOs Cluck, Herring, and Shilling.

Deposition of Michael Showers, Dist. Ct. Doc. 24, Vol. I at 89.

After completing the search of Bear Mountain's business premises, Spangler ordered Showers to show him the freezer located in the basement of the Showers's home. Id. at 107. Over Showers's protests that nothing business related was contained therein, Spangler searched the home's freezer and seized some personal, non-business items.

In the aftermath of the search, Spangler charged Showers with a number of criminal violations. All of these charges were subsequently withdrawn by the Commission after Spangler's superiors intervened.

In addition to the charges stemming from the raid itself, on May 19, 1993, Showers was served with a criminal complaint with respect to the wolf-caribou mount-- the same mount for which Spangler had previously seen proof of legality. On the same day, Officer Spangler publicly "tagged" the mount at a sporting goods shop where it was being used as an advertisement for Bear Mountain Taxidermy.[8]

On June 3, 1993, Showers and his attorney met with Mr. Beard and other ranking members of the Commission. At that meeting, the Commission officers acknowledged that Showers legally possessed the wolf-caribou mount-- as demonstrated to Officer Spangler on March 31-- and the criminal charges were withdrawn the next day. Despite that fact however, and despite repeated requests to do so, Spangler did not remove the tag from the wolf-caribou mount until August 19, 1993, more than two months later.

Showers brought suit within the applicable statute of limitations under 42 U.S.C. S 1983. Asserting violations of the Fourth and Fourteenth Amendments and similar

_____

8. Tagging, in this context, means that Spangler placed a written notice of seizure on the mount itself -- a notice which falsely broadcast that the
item so tagged was possessed illegally. Spangler also ordered the shop owner not to move the mount under any circumstances. Thus, the tagged mount was prominently displayed in a shop frequented by the very sportsmen who are also the clients of professional taxidermists.

8

sections of the Pennsylvania State Constitution, Showers also claimed damages in the form of lost business, damage to his professional reputation, and physical injuries from stress-related disease. The District Court granted summary judgment in favor of all defendants on most of Showers's claims, with the sole exception of a claim against Spangler related to the tagging of the wolf-caribou mount which the court allowed to proceed. Before reaching its decision to grant summary judgment in favor of the defendants on the bulk of Showers's claims, the court ruled unconstitutional the regulation giving Commission officers the power to conduct inspections. See Showers v. Spangler, 957 F. Supp. 584, 591-92 (M.D.Pa. 1997). The court also noted that the facts supported an inference that Spangler's search was merely a pretext for gathering criminal evidence. Id.

Nevertheless, the District Court granted the defendants, including Officer Spangler, qualified immunity from suit on the basis that the "pretext doctrine" was not "clearly established" at the time the search was conducted on April 13, 1993. See id. at 593.9

The defendants subsequently took an interlocutory appeal from the court's denial of summary judgment on the mount-related claims. We dismissed that appeal for lack of jurisdiction. The parties then returned to the District Court and stipulated to the voluntary dismissal of the mount-related claims which, following entry of the court'sfinal order on February 18, 1998, permitted this timely appeal on the claims for which summary judgment had been previously granted.

III.

The only issue now before us is the propriety of the District Court's ruling which granted qualified immunity to
_____

9. The pretext doctrine describes that aspect of the law which recognizes that an administrative inspection may not be used as a pretext to gather evidence as part of what is in fact a criminal investigation. See United States v. Johnson, 994 F.2d 740, 742 (10th Cir. 1993). See also New York v. Burger, 482 U.S. 691, 716 n.27 (1987). We do not rely on this doctrine for our own decision, however.

9

Spangler, and his co-defendants. "[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are `shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional  rights of which a reasonable person would have known.' " Wilson v. Layne, No. 98-83, 1999 WL 320817, at *8 (May 24, 1999) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)) (emphasis added).

When addressing qualified immunity claims, we proceed in two steps. See Sharrar v. Felsing, 128 F.3d 810, 826 (3rd Cir. 1997). First, we must ask whether the conduct alleged by the plaintiff violated a clearly established principle of constitutional or statutory law. See Johnson v. Horn, 150 F.3d 276, 286 (3rd Cir. 1998). If so, then we go on to ask whether the unlawfulness of the action would have been apparent to an objectively reasonable official. Id. Thus, an officer's subjective intent in carrying out the challenged action -- whether malicious or benevolent -- is immaterial to the resolution of questions concerning qualified immunity. Instead, "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the `objective legal reasonableness' of the action, assessed in light of the legal rules that were `clearly established' at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639 (1987) (citation omitted).

At the first step then, in order to determine that a legal right was clearly established at the time of the alleged violation, the right must be "defined at the appropriate level of specificity", id. at 641, because, as the Supreme Court recently reaffirmed, "what `clearly established' means . . . depends largely `upon the level of generality at which the relevant legal rule' is to be established." Wilson, No. 98-83, 1999 WL 320817, at *8 (May 24, 1999) (quoting Anderson, 483 U.S. at 639).

In this case, we believe the appropriate question is the objective inquiry of whether, on April 13, 1993, a reasonable officer would have known that his administrative powers were circumscribed by statute and constitutional requirements to the extent that he could not

10

conduct a search for evidence of criminal wrongdoing
without a warrant. We have no difficulty concluding that a
reasonable officer would have so known.

The Fourth Amendment is designed to protect liberty,
privacy, and possessory interests against arbitrary
intrusion by the government. See Soldal v. Cook County,
506 U.S. 56, 62-63 (1992). It is therefore axiomatic that
Fourth Amendment protections require law enforcement
officers to procure and execute a warrant before conducting
a search, subject only to a few well recognized exceptions.
In this case, one of the well recognized exceptions to the
warrant requirement -- administrative inspections
pursuant to regulatory regimes -- may in fact be implicated
if taxidermy is recognized as a highly regulated business.10

Even so, this exception for administrative searches is
extremely limited. When the Supreme Court considered and
upheld the legality of a warrantless administrative search of
an auto salvage yard in New York v. Burger, 482 U.S. 691
(1987), the Court noted that there was "no reason to believe
that the instant inspection was actually a `pretext' for
obtaining evidence of respondent's violation of the penal
laws." Id. at 717 n.27. Such comment strongly implies that
"pretext" on the part of those conducting an otherwise
proper administrative search will render it unconstitutional.
This conclusion is not novel for it has made its way into
established hornbook law. See David Rudstein, et al.,
Criminal Constitutional Law P 3.06[3][d] (1998).

Spangler correctly points out that the Court's footnote in
Burger is not strictly part of its holding, and that this so-
called "pretext doctrine" was not clearly established in 1993
because no court in the Third Circuit had previously
considered or recognized it. Nevertheless, the Burger
decision otherwise supports reversal.

Whatever the merits of permitting even limited searches
pursuant to administrative regimes, the power to conduct
_____

10. A warrant is generally not required for searches of businesses in
highly regulated industries. See, e.g. Colonnade Catering Corp. v. United
States, 397 U.S. 72 (1970) (liquor); and United States v. Biswell, 406
U.S. 311 (1972) (guns).

11

them is not more extensive than the actual authority vested in the officers by the administrative regime itself.

In this instance, the text of the Inspection Statute, on which Spangler relies, makes three demands of taxidermy permittees: (1) they must "keep accurate records" and "other information" as required; (2) these records must be "kept for a period of three years"; and (3) these records shall be "open to inspection by any officer of the commission." In turn, from these same provisions, an officer of the Commission is vested with the power to inspect said same records and information. We see nothing in the Inspection Statute that may be read to confer a general search power. Indeed, all of the obligations and rights created by the statute are tied to the duty to keep and ability to inspect a permittee's records.

The Inspection Regulation -- upon which Spangler was also entitled to rely at the time of the search, despite its constitutional infirmities -- is worded more broadly but is also ultimately tied to the records kept under the permit. The Inspection Regulation also requires permittees to "keep a record" of transactions, but states that "[t]he record, together with the premises, shall be open to inspection upon demand . . . ." Thus, the Inspection Regulation seems to include an additional aspect relating to premises not provided by statute. But even broadly construed, such language is insufficient to grant officers of the Commission the type of sweeping search power Spangler claims. At best the Inspection Regulation conferred a limited power to search the transaction records of permittees-- albeit under all too generous terms of time (on demand) and place (the premises).

In other words, even when we consider the administrative regime in this case and construe it liberally, we conclude that there remained for all objectively reasonable officers a discernable difference between an inspection of records, for which no warrant was required, and a search for which a warrant was always required absent consent from the person being searched. This interpretation is far from

12

unique and the record as a whole strongly corroborates it as the prevailing view.[11]

The foregoing limitations on an administrative search also rest on the specific language of the Supreme Court in Burger. The Court justified the search in that case in part on the basis that, if those conducting searches operate within the powers granted to them by the statutory scheme, those being searched "[know] that the inspections to which [they are] subject do not constitute discretionary acts by a government official but are conducted pursuant to statute." Burger, 691 U.S. at 711. The Court went on to add that, when the scope of the law is set forth, the statute "places the operator on notice as to how to comply with the statute." Id. Finally, Burger emphasized that administrative searches must be limited by the terms of the statutes which authorized them in order "to place appropriate restraints upon the discretion of the inspecting officers." Id. Thus, the law barring random and extensive administrative searches had been clearly established since at least the Burger case in 1987.

Here, Spangler designed "Operation U-haul," from its conception, as a search outside the statutory authority for an administrative inspection -- creating a search for criminal physical evidence and not an inspection of a taxidermist's records. As the District Court noted, Spangler's efforts to plan and conduct an exhaustive search of Showers's home and business had all the hallmarks of a purely criminal investigation: he focused on possible criminal wrongdoing well in advance of the actual search, for which he planned extensively and organized a large show of force; he applied for a warrant, knowing that

_____

11. As but one example, in his deposition testimony, co-defendant Beard discussed the general understanding of search and seizure principles within the Commission and among its officers, and he noted that such a distinction was understood. He said, inter alia,

> [In my answers] I'm trying to keep [a] search separated from an inspection. You know, an inspection is an inspection. A search is a search. When you search, you have a search warrant or you have [ ] consent . . . .

App. at 168a.

13

Showers indicated he would refuse consent, and implying that he knew a warrant was in fact required. Yet at the time of the search itself, he failed to serve the warrant as required by law. These actions violated the clearly established parameters of both the Inspection Statute and Inspection Regulation upon which he relied for his authority.

Thus, a reasonable officer in Spangler's position would have known that the actions he undertook in this case were not authorized by either the administrative statute or regulation then in place. Because the boundaries of his inspection authority were, in fact, clearly established -- and did not include the use of administrative inspection to randomly and extensively search for evidence of crimes -- Spangler is not entitled to qualified immunity. His liability, if any, for the search of April 13, 1993 is for a jury to decide.

Having held that Officer Spangler is not entitled to qualified immunity, we must briefly consider his co-defendants. Unlike Spangler, each of the other officers and officials named in the suit, on these facts, appear to have carried out their duties in an objectively reasonable manner. Four of the defendants -- Officers Haynes, Houghton, Kessel and Smith -- did participate in the illegal search. However, all four participated under Spangler's direct operational control and the record discloses nothing to suggest that any of them knew that Spangler was exceeding his authority. As to the remaining four defendants -- Supervisors Sloan, Beard, Clouser, and Fagan -- nothing on the record suggests that they were aware of the search before it took place. While they knew of Showers's complaints against Spangler, and might well have intervened more forcefully, such tangential supervisory involvement cannot support liability and certainly does not undercut the District Court's justifiable conclusion that they are entitled to qualified immunity.

Accordingly, we reverse the District Court's order granting summary judgment in favor of Spangler and remand for a jury trial to determine both immunity and

14

liability. As to all other defendants, however, summary judgment in their favor is affirmed.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

15