RENDELL, Circuit Judge,
concurring.
I agree with the majority that the District Court acted prematurely when it dismissed plaintiffs’ First and Fourth Amendment claims at the pleading stage, and, accordingly, concur in the judgment. I write separately to express my disagreement with the majority’s reasoning regarding two substantive aspects of those claims: whether we can conclude, based on this record, that 18 U.S.C. §§ 2257 and 2257A advance a substantial government interest, as required to satisfy intermediate scrutiny under the First Amendment, and whether the administrative-search exception to the warrant requirement can apply to plaintiffs’ Fourth Amendment claims.
I.
The majority correctly points out that the first step of the First Amendment intermediate-scrutiny analysis asks whether the challenged regulations advance a “substantial” governmental interest. Maj. Op. 535. While I agree, as the plaintiffs do, that the government’s interest in protecting children and preventing child pornography is substantial, I cannot agree with the majority’s conclusion that the government has “adequately demonstrated” at this stage of the litigation that sections 2257 and 2257A advance that interest. See Maj. Op. 536.
The Supreme Court has found this prong of the intermediate-scrutiny test satisfied where record evidence establishes that the challenged regulation serves the government’s interests “in a direct and effective way.” Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 213, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (“Turner II”) (internal quotation marks omitted); see also Ward v. Rock Against Racism, 491 U.S. 781, 800, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). In my view, no evidence in the record here — which, given the case’s procedural posture, is extremely sparse — establishes a “direct and effective” connection between the government’s interest in preventing child pornography and the extensive and burdensome recordkeeping, labeling, and inspection requirements imposed by sections 2257 and 2257A.
Like the District Court, the majority is persuaded that the recommendation in the 1986 Report of the Attorney General’s Commission on Pornography (the “Pornography Report”) that Congress should enact section 2257, based on the Commission’s findings that a market for child pornography continued despite previous legislative efforts to stop it and that producers of sexually explicit images often use young-looking performers, satisfies the government’s burden as to this aspect of the test. See Maj. Op. 535. I am not so persuaded. Neither the District Court nor the majority points to anything — in the Pornography Report, the legislative history, or elsewhere — that asserts that, or explains how, these statutes provide an effective response to the problems the Pornography Report and Congress diagnosed.[1] More *547 over, although section 2257 has been on the books for almost 25 years, the record contains no evidence as to producers’ or the government’s experience under the statute, and, therefore, no means of assessing whether the requirements actually have had any deterrent or preventive effect.[2]
In the absence of such evidence, it is easy to think of reasons the statutes might not accomplish their desired result. For example, given the substantial federal and state criminal penalties for creating and distributing child pornography, see generally 18 U.S.C. §§ 2251-2254, 2256; Pornography Report 602-08 (summarizing federal and state child pornography laws), and the Pornography Report’s finding that “[s]exual exploitation of children has retreated to the shadows,” id. at 609-10, it is hard to fathom that the statutes’ record-keeping requirements would make anyone who was already inclined to engage in such activities change his behavior. An unscrupulous producer who seeks to distribute images using underaged (as opposed to merely young-looking) performers could falsify his records, and a producer who operates underground is not likely to follow the recordkeeping requirements at all. Similarly, a child determined to pass herself off as an adult could easily provide false identification to the producer.
I am mindful, of course, that we owe deference to Congress’s predictive judgments as to whether a statute will materially alleviate the substantial harm it is designed to address. Turner II, 520 U.S. at 195, 117 S.Ct. 1174. But we retain an “obligation ... ‘to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence.’ ” Id. (quoting Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 666, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (“Turner /”)). In this case, the Pornography Report’s ipse dixit forms the only link between the statute and the asserted harms. There has been no showing that Congress made any predictive judgment about the statutes’ likely effects, much less a determination that any such judgments were “reasonable” or “based on substantial evidence.”
For these reasons, I would have asked the District Court to explore this issue more fully on remand rather than affirming the District Court’s determination that the government established that sections *548 2257 and 2257A advance its substantial interest in preventing child pornography at the motion to dismiss stage.
II.
The majority remands plaintiffs’ Fourth Amendment claims for further development of the record concerning whether the searches alleged in this case constitute common-law trespass under United States v. Jones, — U.S.-, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012), and whether the administrative-search exception applies. Maj. Op. 542-45. I agree that the record does not provide enough information for us to determine the impact of Jones, but I disagree with the majority as to the need for further consideration of the administrative-search exception. In my view, no set of facts could justify the application of that exception to a warrantless inspection conducted under section 2257 or 2257A.
As in all Fourth Amendment cases, we begin with the general requirement that “Fourth Amendment protections require law enforcement officers to procure and execute a warrant before conducting a search.” Showers v. Spangler, 182 F.3d 165, 172 (3d Cir.1999); see also Marshall v. Barlow’s, Inc., 436 U.S. 307, 323-24, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (“[T]he Warrant Clause applies to inspections for compliance with regulatory statutes.”). The administrative-search doctrine is one of “a few well recognized exceptions” to the warrant requirement, but its scope “is extremely limited.” Showers, 182 F.3d at 172.
As a threshold matter, the statute and regulations must target businesses within a “pervasively regulated” industry to qualify for the exception. See Barlow’s, 436 U.S. at 313, 98 S.Ct. 1816. Whether a particular industry satisfies that test depends on “ ‘the pervasiveness and regularity of the federal regulation,’ ” the “effect of such regulation upon an owner’s expectation of privacy,” and “ ‘the duration of a particular regulatory scheme.’ ” New York v. Burger, 482 U.S. 691, 701, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). Assuming the statute and regulations apply to a pervasively regulated industry, the warrantless inspections they authorize must satisfy three requirements to qualify as “reasonable” under the Fourth Amendment: (1) “there must be a ‘substantial’ government interest that informs the regulatory scheme pursuant to which the inspection is made”; (2) “the warrantless inspections must be ‘necessary to further [the] regulatory scheme’ ”; and (3) “ ‘the statute’s inspection program, in terms of the certainty and regularity of its application, [must] providfe] a constitutionally adequate substitute for a warrant.’ ” Id. at 702-03, 107 S.Ct. 2636 (alterations in original).
At least two aspects of that analysis are problematic in this case. First, sections 2257 and 2257A do not target a “pervasively regulated” industry. Indeed, the statutes and their associated regulations are not specifically directed at any industry at all — as the majority properly concludes, they govern purely private conduct and sexually explicit images that are traded clandestinely and over the Internet, as well as commercially produced pornography. Maj. Op. 538-40. But even if we were to ignore that fact and assume, contrary to their plain language, that sections 2257 and 2257A do specifically target the adult-entertainment industry, I do not see how we could conclude that industry is “pervasively regulated” as the term has been applied.
The District Court relied on the “steadily strengthening web” of statutes enacted over the last thirty years to “protect[] children from sexual exploitation” to con- *549 elude that the adult-entertainment industry is “pervasively regulated.” Free Speech Coal., Inc. v. Holder, 729 F.Supp.2d 691, 753 (E.D.Pa.2010). But the statutes to which it refers are general criminal prohibitions on the creation and distribution of child pornography; they are not specific regulations governing the way that commercial, adult pornographers conduct their business. Cf. Frey v. Panza, 621 F.2d 596, 598 (3d Cir.1980) (per curiam) (affirming application of administrative-search exception to warrantless inspections of houses under construction in part because the municipal building code under which the inspections were conducted “is directed specifically and exclusively at that one industry”). Moreover, as general, criminal statutes, they do not imply any diminution in an adult-entertainment producer’s expectations of privacy. At the very least, the government has not shown, and it seems to me that it would be difficult for it to show, that the adult-entertainment industry is governed by the type of specific, extensive, and intrusive safety or health regulations that exist in other industries — liquor distribution, gun sales, stone quarrying and mining, automobile junkyards, veterinary drugs, transportation of hazardous materials — that courts have deemed pervasively regulated for purposes of the administrative-search exception. See United States v. 1,132 Mastercases of Cigarettes, 448 F.3d 1168, 1176 (9th Cir.2006) (listing “closely regulated” industries subject to administrative-search exception).
Second, the warrantless inspection regime created by sections 2257 and 2257A is not necessary to further the statutes’ purpose. This is not a case where the government must conduct random, unannounced inspections of a business premises to ensure health and safety (as, for example, in the case of mine inspections, see Donovan v. Dewey, 452 U.S. 594, 603, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (noting the “notorious history of serious accidents and unhealthful working conditions” in the mining industry)).[3] In fact, such inspections are not even needed to ensure compliance with the statutes. The District Court reasoned that a warrantless inspection program “encourages producers to follow the age-verification procedures regularly and in advance of the production of the depictions, and deters the possibility of fabrication or after-the-fact compilation of such information.” Free Speech Coalition, 729 F.Supp.2d at 754. But the amount and nature of the information the statutes and regulations require producers to record (performers’ names, dates of birth, and aliases; copies of the performers’ identification; a copy of the depiction; and the date of the original production of the depiction, see 18 U.S.C. §§ 2257(b), 2257A(b); 28 C.F.R. § 75.2(a)) and their complicated indexing requirements (records must be organized alphabetically by performer’s name and indexed or cross referenced by the performers’ aliases and the title of the production, see 28 C.F.R. § 75.2(a)(3)) make it exceedingly unlikely that producers could fabricate and compile such records after the fact on short notice, as would be required to comply with a subpoena or warrant.
More fundamentally, inspections of the required records could be conducted using *550 warrants with no greater difficulty, and with no different results, than without. Warrants could issue on cause to believe that the producer is using child subjects in violation of the law based on appearance, as is always the case, or as part of “an administrative plan containing specific neutral criteria.” Barlow’s, 436 U.S. at 323, 98 S.Ct. 1816; see also Martin v. Int’l Matex Tank Terminals — Bayonne, 928 F.2d 614, 622 (3d Cir.1991) (explaining that probable cause for an administrative warrant may arise out of either “specific evidence of a violation” or “an administrative plan containing specific neutral criteria”). Tellingly, neither the government nor the District Court has explained why the government’s goal of ensuring compliance and deterring the fabrication of records would not be served by warrants issued on short notice as part of a regular, administrative enforcement scheme.
For these reasons, I cannot accept the District Court’s loose interpretation of the administrative-search exception’s “necessity” requirement or believe that the warrant requirement can so easily be brushed aside. Requiring the government to establish probable cause for a search, whether based on suspected violations or as part of an overall administrative inspection plan, is no more than the Fourth Amendment requires. Doing away with warrants in this instance creates a slippery slope whereby the government is permitted to test compliance with a law without the need for probable cause: if the simple goal of ensuring compliance with record-keeping requirements and deterring fabrication of those records is enough to justify warrantless inspections of businesses and homes in this case, I see no legal barrier to also permitting federal authorities to enter businesses and homes without a warrant to inspect tax records and supporting documentation. As the absurdity of this example illustrates, the government’s justification for the administrative-search exception does not meet the criteria for the narrow exception the Supreme Court, and we, have carved out in our jurisprudence.
As noted above, I concur in the judgment because I agree that the District Court should consider in the first instance how Jones impacts plaintiffs’ Fourth Amendment claims. But I would conclude as a matter of law that the administrative-search exception to the Fourth Amendment’s warrant requirement does not justify the warrantless inspections authorized under sections 2257 and 2257A.

. My own assessment is that the evidence and reasoning set forth in the Pornography Report regarding the recordkeeping requirements are quite thin. The Report finds in some detail that the type of child pornography that persisted after federal and state bans were enacted was distinct from the adult-entertainment industry, mostly non-commercial in nature, and involved people who were unlikely to be deterred by criminal sanctions. See, e.g., Pornography Report 406 (''[T]he industry of child pornography is largely distinct from any aspect of the industry of producing and making available sexually explicit materials involving *547 adults.”); id. at 410 ("The greatest bulk of child pornography is produced by child abusers themselves in largely ‘cottage industry' fashion, and thus child pornography must be considered as substantially inseparable from the problem of sexual abuse of children.”); id. at 610 ("Wholly commercial operations appear to be extremely unusual____"); id. ("However strong the criminal law, sexual exploitation of children is likely to remain an irresistible temptation for some.”). The recommendation that Congress enact a record-keeping statute, by contrast, grew out of an observation that commercial pornographers use models that look "as young as possible,” id. at 855, and an assertion that "[t]he growth of pseudo child pornography has made it increasingly difficult for law enforcement officers to ascertain whether an individual in a film or other visual depiction is a minor,” id. at 618. The Report does not cite any evidence of the use of performers who are actually underaged or the asserted law-enforcement difficulties.

. Some relevant questions in this regard include: Do producers of sexually explicit materials actually keep the required records? Have they ceased using underage subjects? How does the Department of Justice enforce the statutes or regulations? How many people have been prosecuted under sections 2257 and 2257A? The Pornography Report’s discussion of enforcement of the federal child pornography laws provides an example of the type of data the government might supply to answer these questions. See Pornography Report 415-16.

. The District Court finessed this issue by tying the inspections to the prevention of the sexual exploitation of children, see Free Speech Coalition, 729 F.Supp.2d at 754, but that link is attenuated at best. The inspections do nothing to ensure compliance with the criminal laws’ substantive prohibitions on creating or distributing child pornography; they only test compliance with the record-keeping requirements of sections 2257 and 225 7A.